We'll hear the first case, Mandela v. NTT. Good morning, Your Honors. May it please the Court, Rachel Bien for appellants. George Mandela and Charles Barnett are African Americans who allege they were denied employment as a result of NTT's policy of automatically excluding applicants with felony convictions. They have plausibly pleaded that this policy violates Title VII because of its disparate impact on black applicants. Iqbal and Twombly set a low bar for the factual matter that a complaint must contain. Plausibility is not a probability requirement. It simply requires enough factual matter to state a claim for relief that is plausible on its face. In a Title VII disparate impact case, the complaint must allege facts that render it plausible that an employment practice has the effect of denying members of a protected class. It's not clear to me whether the district court applied or required a prima facie case as part of the pleading. What's your view? I mean, the district court states the plaintiff's position that under Swierkiewicz you don't look at that, but the district court doesn't actually rule on the issue. That's right. I think that the court certainly expressed doubt as to whether Swierkiewicz's holding that you don't apply the prima facie requirements at the pleading stage is still good law, even though this Court has rejected the notion that that part of Swierkiewicz was overruled by Iqbal and Twombly. The Court cites cases setting forth a prima facie standard as to what allegations should be in the complaint. But I think that the fundamental problem with the district court's decision is that it rejected use of general population statistics to serve as the plausible factual basis for showing that the particular employment policy here causes a disparate impact. That is not the correct standard. For many, many years the Supreme Court has said that certainly general population statistics can be the adequate labor pool, even at the prima facie standard at the prima facie stage. So to require it at the pleading stage under that case law must be wrong. So can I ask you about that? Is that, in your view, always going to be adequate to rely on general population standards no matter what job you're talking about? So I'll give an example. Let's say chemical engineering jobs. I don't know. Just randomly. Would you always be able to just use general population statistics without ever asking whether or having any need to allege that those accurately reflect the characteristics of the pool of applicants for, say, chemical engineering jobs? At the pleading stage in a case like this where we're alleging an overbroad exclusion policy, yes, because the general population statistics show that overwhelmingly there are these disparities between blacks and whites, not just in rates of arrest, but rates of arrest, rates of convictions, rates of incarceration. But that's not necessarily true for people who have engineering degrees, right? It is. I think that the disparities are so profound that the reasonable inference to be drawn from those statistics is that they would be relevant or that those disparities would exist regardless of the particular job that the person is applying. What's your basis for saying that? I mean, I assume that's empirically testable, but your view is that people who have advanced degrees are experiencing different rates of arrest and incarceration based on race? Your Honor, there aren't specific data that I could cite to. The sort of granular data that you're referring to simply just does not exist. At the pleading stage... So, would you find that such data if you were given discovery? Yes. If it doesn't exist, why do you think you'll get it if you have discovery? If we have discovery, we can look at NTT's actual applicant poll. We can determine what the qualifications for the job actually are. We can compare the applicants who were African American versus Caucasian, and we can determine whether African Americans were excluded at higher rates than white applicants because of criminal records. So, we can look at all of those features once there is discovery, but to require that plaintiffs prove that from the outset or allege that from the outset when that data doesn't exist... Well, hang on a second. So, if I could just interrupt you. You're saying the data doesn't exist. Did you allege that the data doesn't exist? I mean, why should we believe you that the data doesn't exist? The... I think that there... Let me put it this way. If your opponent comes up here and says the data totally exists, wouldn't my response properly be to them, well, it's not a record. Am I just supposed to intuit? I mean, I don't know what data exists in the world. If you look at, for example, the EEOC's guidance in this area, they rely on the national population statistics, which they say are so profound that they give rise to the serious risk that an overbroad exclusion policy is going to exclude more African Americans than whites or minorities over whites. Your argument is that the general statistics which do exist provide you with a plausible claim that once you drill down, you'll see that indeed the disparities exist on a more specific basis? Yes, that's right. A reasonable... But why is that the case? I don't understand. Height and weight requirements, it's pretty clear. The general population and the particular applicant pool are going to be pretty similar. One can infer that. But it's not at all clear to me why the applicants for this position and the people who meet the qualifications for this position are going to be anything similar to the general population of the incarcerated universe. I have a few responses to that. First, at this stage, we really don't know that this is somehow a uniquely and different kind of position  Don't you have to plead what the requirements are? Don't you have to plead something about this particular job that would allow us to infer that the national statistics are relevant? Yes, and we have. First of all, the company applies this exclusion policy regardless of the particular job that the person is applying to. I'm sorry, I see my time is up. If you wouldn't mind if I answer the question. I think one is that we're talking about a company, as alleged, that applies its exclusion regardless of the particular job that someone is applying to. But I think more to your point, the national statistics show disparities that are so profound that it would in fact be unreasonable to assume that they're not impacting NTT's applicant pool, at least to some degree. And thus, it would be plausible to infer that using such a broad exclusion policy that they're using is going to have a disparate impact on African American applicants given these profound disparities that we're seeing across the general population. Thank you. May I just ask one more question? I'm sorry. If I could just ask you to clarify a different point. I understood in the briefs that there was some dispute over what the plaintiffs are claiming the policy is, whether it's a policy of denying consideration to anyone with any sort of criminal conviction or someone with a felony conviction. I had understood from your briefs that you were arguing that it was any criminal conviction. But in your introductory remarks, you mentioned felonies. And I was wondering if you could just clarify what your side's position is with respect to what you have alleged or what you now contend is the policy. Yes. In our complaint, we were deliberately somewhat broader in scope because we do not yet know the precise contours of the policy. What we know from what was told to the plaintiffs was that they were told that they were denied employment because of their convictions and also, in another instance, because of their felony convictions. So as a result of that, we deliberately pleaded somewhat broader to say they were denied employment because of their certain convictions, including felony convictions. And we can refine that as we are able to move forward in discovery. I think, though, that regardless of whether it is a somewhat broader conviction exclusion, the statistics that we cite speak to all of those things. Regardless of whether it is a conviction or a felony conviction or a rate of incarceration, the disparities are so profound that they would impact NTT's applicant pool, just like any other employer's applicant pool. Thank you very much. Thank you. We'll hear from the other side. Good morning, Your Honors. Jessica Pizzatelli for NTT Data. May it please the Court. This case presents two questions. What is the pleading standard for a disparate impact claim, and have plaintiffs met that standard here? As counsel expressed, Ashcroft v. Iqbal is binding, and that case stands for two propositions. You need to note the elements of the claim, and the standard is plausibility, not possibility. You need to plead facts. Pleading facts that are merely consistent with liability is not enough to survive a motion. Do you need to plead a prima facie case? Yes. According to Brown v. Coach Stores, a decision out of the Second Circuit in 1998, that court held that to establish a prima facie case of disparate impact, a plaintiff must show that a facially neutral employment policy or practice has a significant disparate impact. That court was deciding a 12B6 motion to dismiss a disparate impact claim. And what about Swierkiewicz? Swierkiewicz would not be binding here. Swierkiewicz was limited by Iqbal and Twombly. This court later recognized in the Littlejohn case that a prima facie case should be pled in a Title VII case. That was a disparate treatment case, I acknowledge. So I would say that Brown v. Coach Stores would still be binding authority, and that a prima facie case should be pled in a And applying that basic pleading standard of plausibility and not possibility and that a plaintiff must plead facts to plausibly allege a prima facie case, I would submit to the Court that that standard has not been met here. In the prima facie case, a plaintiff must allege facts that there was actually a policy that caused a disparate impact at the employer in question, and that has not been pled here. The complaint is totally bare of any allegations that there was any disparity at NTT data. It is not enough to come into court and allege generic, inopposite, general population statistics, and then submit to the Court that the employer somehow has some kind of disparity at their workplace. There must be more. Isn't there allegation that they don't really have to prove the outcome? You can look at this either two ways, right? This is a disparate impact case, right? You can say, well, look, there's a look at the population of people who are working at whatever company. It's not racially representative. And then there are cases saying, like Ward's Cove, that may not be enough, but you can look at the output, and then you can sort of say, well, here's a policy, and try to prove that the policy generated this racially impactful. And then you can look at the inputs. The input here is the policy, which is, for statistical reasons, very likely to generate a disparate outcome, and say, well, we don't have to know who's working at NTT, because we can, as a matter of logic, say that this disparate, this choice, this policy choice they make is going to yield a certain outcome. So you can work at it from the outcome and reason backwards to the policy must be racially impactful. Or you can take the policy and say, well, we know that there's going to be an outcome, and let's have discovery to find out how it plays out at NTT. Isn't that just what they're doing here? They're looking at the input, not the output. Exactly. They're looking at the input and the output. And you need to plead both. So you need to look at your relevant, the teachings of Ward Cove. You need to look at your relevant labor pool. You need to put your inputs through the screen of the policy, and then see what those outputs are. And it's the outputs that you need to allege there's a disparate impact at that particular employer. Well, what if their statistics said, I don't know, just take something. Let's just take the numbers were terribly skewed. You know, 90 percent of a protected class had whatever the characteristic, and their policy was we shall not offer a job to anyone with that characteristic. Wouldn't that give you a case? Well, that's a good question. Let's say 99 percent of the population of this racially protected class had characteristic X, and we will not hire anybody with characteristic X. At a certain point, wouldn't you agree that the statistics can become strong enough that they can yield a plausible inference of disparate impact? I wouldn't agree with that. I think that you have to look at your relevant labor pool. And if your labor pool isn't the group that has the 90 percent characteristic going through the screen, then you wouldn't have a disparate impact on the outcome. You have to look at the facts. It's a context-specific allegation. You need to look at the facts as pled. Well, what if somebody said, NTT said, we will not hire anyone with sickle cell anemia. And they had statistics that say there's an incredibly higher rate of sickle cell anemia incident in the African-American population. Wouldn't that get you a disparate impact claim? I disagree. You would need to look at your pool of applicants. You would need to see whether that pool of applicants has that type of characteristic. And then you look at your policy and look at the outcome. And if the outcome is there's a disparate impact, or if there's some kind of suggestion that in that employer's workforce that there is a disparate impact, then that is where those are the facts that you need to allege to establish your claim. Are you saying that general statistics are totally irrelevant? I'm not saying general statistics are totally irrelevant. What I'm saying is I've seen in the case law... Why don't the general statistics, at least at this stage, given that Little John says you only need to give plausible support to a minimal inference of discrimination, why don't the general statistics create a plausible claim? The general statistics don't create a plausible claim because in the input and output analysis, they just speak to the input. They don't speak to the Well, otherwise it would seem any job that requires a background check would be presumptively getting to discovery, right? Well, that's correct, Your Honor, and that's exactly what plaintiffs appellants are advocating for here, essentially asking this court to issue a per se rule that says whenever national statistics are pled, plus some kind of blanket ban or policy, and we have a dispute over what type of a policy was the factual allegation support in the complaint was adequately alleged, but a per se rule that national population statistics plus a blanket ban gets you through to a motion to dismiss, unlocks the doors to discovery, and grants plaintiffs access to confidential employee and applicant data, and that's simply not enough. That's been rejected, I would say, recently by the Texas v. EEOC Fifth Circuit case, which has specifically acknowledged that the EEOC guidance is not or granted an injunction saying the EEOC couldn't enforce its guidance because it wasn't adequately supported by rulemaking. The EEOC v. Freeman case I think is also instructive in that regard, as well as the L v. SEPTA case where the Court specifically acknowledged that there is nothing per se unlawful about having a blanket ban and acknowledging the EEOC guidance and the fact that the EEOC guidance cites these national statistics. So there's nothing per se unlawful about having that. So if you can walk into court and allege national population statistics that have nothing to do with the employer in question and then a blanket ban, which is not per se unlawful, you cannot possibly have enough to get past a motion to dismiss on a dispute. Roberts. Well, the question isn't whether it's per se unlawful. The question is whether it has a disparate impact. Correct. And I think that's a different question from whether it's per se unlawful. And there are no facts pled here that there was any disparate impact, that the output had any disparate impact at NTT. I think my point was that it would be per se getting to discovery. It would be per se getting to discovery. But in order to get to discovery, you need to plausibly allege a claim for relief. And those — Would you agree that — I can't remember the particular jobs. I think one of them might have been a web developer. That's correct. If there were statistics pled by the defense, or by the plaintiff, that said a disproportionate number of web developers, African-American web developers, have criminal convictions, would you agree that that would be enough for them to show disparate impact for the pleading stage? I would not agree. I would say you would then need to look and then allege with some sort of factual basis that within NTT data there's a disparate impact on African-Americans and the percentage of African-Americans that hold the web developer positions. Thank you. Thank you. We'll hear from — we'll hear the rebuttal. May it please the Court, my name is Rachel Kleinman for appellants. I find it extremely telling that counsel for NTT says that plaintiffs would have to rely on an actual impact to state a plausible claim for relief. That is the summary judgment standard, not the standard for pleading. Numerous cases have relied on statistics, including general population statistics, but certainly other statistics about the, as opposing counsel was calling it, the inputs to plead a disparate impact case. If the standard that NTT says is the correct standard were implemented, there would be no Title VII disparate impact cases. That's not the kind of information that plaintiffs have at this stage. We do not know what the actual impact of the policy is at NTT. What we do know is that these kinds of policies, criminal background bans, are particularly likely to have a disparate impact. We know that. Let me ask you a different question. It's hypothetical. So for a job requirement that said you have to have a college degree, all you would need to get to discovery for a disparate impact claim would be to show that different races or genders or ethnic groups have different rates of college degrees. Correct? That's right, Your Honor. That's all you need to do. In addition to the other parts that you have an actual plaintiff who is subject to this policy, yes, that is enough to get you over the plausibility standard to get to discovery. There are certainly other mechanisms post the motion-to-dismiss stage that could easily get rid of cases that are not meritorious. In this case, the general population statistics, again, are so profound, are so pervasive that the reasonable inference is that no matter how you slice and dice them, you will find a disparity. Is it possible that in this case that NTT's workforce is in fact immune from these disparities? Yes, it is. And there are other places. All NTT has to do is produce that data. Look, this policy, the way we applied it because of our particular workforce, it doesn't have a disparate impact in this case. And then that's not going to be a claim that goes that's going to claim that's going to get dismissed on summary judgment. Presumably any man could bring a disparate impact claim because the data with respect to men and women committing crimes is also, is even starker, right? If there were, I mean, I think that would be an unlikely claim that anybody would bring because it is unlikely that there is, that that is likely to survive any sort of summary judgment claim. Why is that? If your whole point is that the policy is applied blindly, right? Your allegation is that if you have a criminal conviction, you're out the window, right? Not that they're going to give you a case-by-case evaluation and that a higher number of people with criminal convictions, therefore, are going to get chucked out of the pool. Why wouldn't that be true of men? They're just getting knocked out of the box. They're not getting a second look. Because the, I still think you would have a different, you would have a different analysis when you got to the business necessity of the policy. But I thought the business necessity would, would focus on whether the, you know, criminal convictions matter to someone's performance of the job duties. It wouldn't matter whether it was a, an African American with a criminal conviction or like, you're not suggesting that they would be more justified in keeping out men who are convicted than keeping out African Americans who are convicted. No, I'm not. But I do not know the statistics versus men versus women in the criminal justice system. I don't know. Assume for the sake of argument that they're similar. I would say no matter what the protected class is, if there were, if we're looking at statistics where a particular, particular protected class has, is severely, pervasively disparate impacted in the general population and there is a policy that relies on that, then absolutely. If you look at the Dothert case, again, that was, that was a gender case. And it was about height and weight. And in fact, that the Dothert court relied on the general population statistics and I realize that was in summary judgment. I understand that perhaps the inferences aren't as strong in a criminal justice background case than in a gender case. But again, that is, that is a gender case where they relied on general population statistics. But isn't that just because it was about height and weight and there was the shorter or taller than people throughout America. Certainly. That's different from suggesting that the general population of everyone in America matches the general population of people qualified to be web developers. That is certainly true, Your Honor. The inference is definitely stronger in the case where you're talking about height and weight because there's no reason. We believe the inference here is a very strong one. It might not be as strong. But again, in the Dothert case, that was in summary judgment where after a bench trial they relied on those statistics. We're not talking about the pleading standard. Whereas here, this is just plausible enough to get us over the hump. And I think in fact that it is probable, not just plausible, that any kind of blanket ban on employment, given how profound and pervasive how these statistics are, will at least have a disparate impact. And then, so that should get us over the hump to discovery at which point NTT would have the ability to show that their workforce is immune. Thank you. We have your argument. Thank you.